Susan CURRY, James Kleissler, Arthur Clark and Heartwood, Inc., Plaintiffs,

v.

UNITED STATES FOREST SERVICE, Michael P. Dombeck, Chief Forester, United States Forest Service, Robert T. Jacobs, Regional Forester for the Eastern Region, United States Forest Service, and John Palmer, Forest Supervisor for the Allegheny National Forest, United States Forest Service, Defendants.

No. Civ.A. 97–1081.

United States District Court, W.D. Pennsylvania.

Oct. 15, 1997.

William V. Luneberg, Jules Lobel, Pittsburgh, PA, for Plaintiffs.

Michael C. Colvile, Asst. U.S. Atty., Pittsburgh, PA, Michael J. Danaher, Leslie Auriemmo, Assoc. Regional Attys., U.S. Dept. of Agriculture, Milwaukee, WI, Ronald Mullach, U.S. Dept. of Agriculture, Washington, DC, for U.S. Forest Service.

Henry Ingram, James W. Mizgala, Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Allegheny Hardwood Utilization Group, Inc.

### MEMORANDUM

STANDISH, District Judge.

I

In this civil action, plaintiffs, Susan Curry, James Kleissler, Arthur Clark and Heartwood, Inc., seek judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., of a decision of defendant Robert T. Jacobs, Regional Forester for the Eastern Region of defendant United States Forest Service, affirming the decision of defendant John Palmer, Forest Supervisor for the Allegheny National Forest, to approve a project known as the "Mortality II Project," which involves sales of timber for logging from the Allegheny National Forest. Specifically, plaintiffs seek declaratory and injunctive relief, alleging that the proposed timber sales violate the National Forest Management Act (NFMA), 16 U.S.C. § 1600 et seq., the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 710 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.[1] Presently, before the court are the parties' cross-motions for summary judgment. After consideration of the briefs of the parties,[2] as well as the

1. Plaintiffs' right to judicial review of defendant Jacobs' decision is set forth in Section 702 of the APA. Defendants do not challenge plaintiffs' standing to bring their NFMA and NEPA claims under the APA nor do they dispute that the decision of defendant Jacobs is a final agency decision for purposes of seeking judicial review.

Defendants do dispute, however, the court's jurisdiction to consider plaintiffs' MBTA claim under the APA.

2. Plaintiffs' brief in support of issuance of declaratory and injunctive relief, which was filed on June 24, 1997, has been deemed to be a brief in

administrative record in this case, the court concludes that (1) plaintiffs' motion for summary judgment should be granted in part as to their claims against defendants under the NFMA; (2) plaintiffs'· motion for summary judgment should be granted as to their claims under NEPA, and (3) defendants' cross-motion for summary judgment should be granted as to plaintiffs' claim under the MBTA.

## II

The following facts are undisputed:

The Allegheny National Forest is located in Elk, Forest, McKean and Warren Counties in Northwestern Pennsylvania. The forest is comprised of 510,530 acres, including water areas. (Admin. Record, Folder D–3, Summary, p. i–iv). Plaintiffs Susan Curry (Curry), James Kleissler (Kleissler) and Arthur Clark (Clark) are residents of Clarion County, Pennsylvania, who utilize the Allegheny National Forest for study, as well as for recreational and aesthetic enjoyment. Curry and Kleissler devote much of their time and effort to the work of the Allegheny Defense Project, a regional organization that is dedicated, *inter alia*, to restoring the ecological· integrity of the Allegheny National Forest.

Plaintiff Heartwood, Inc. (Heartwood) is a non-profit Indiana corporation whose purposes include the protection of biodiversity and ecosystem integrity on public and forested lands in Pennsylvania and the central hardwood region of the United States. Heartwood has members residing in the Commonwealth of Pennsylvania who have used and enjoyed the aesthetic and recreational opportunities afforded by the Alleghe-

ny National Forest in the past, and who wish to enjoy and use them in their present state in the future. Curry, Kleissler and Clark are members of Heartwood.

Defendant United States Forest Service (the Forest Service) is an agency of the United States that is statutorily mandated to manage the National Forest System, including the Allegheny National Forest, in the public interest. The individual defendants are officials and employees of the Forest Service.

The Allegheny National Forest is currently being managed under a Land and Resource Management Plan (the LRMP), which was adopted in 1986 by the Forest Service pursuant to the Forest and Rangeland Renewable Resources Planning Act (FRRRPA), as amended by the NFMA.[3] (Admin. Record, Folders D–1 and D–2). Under the LRMP, the Allegheny National Forest is divided into Management Areas, which are areas of land that have a common management direction to achieve a common goal. All Management Areas are described and policies and prescriptions relating to their use are listed in the LRMP. The Management Areas for the Allegheny National Forest are numbered 1, 2, 3, 5, 6.1, 6.2, 6.3, 6.4, 7, 8 and 9.1. (Admin. Record, Folder D–1).

On February 5, 1997, defendant John Palmer, Forest Supervisor for the Allegheny National Forest, issued a Decision Notice and Finding of No Significant Impact (DN/FONSI), which approved a project known as the Mortality II Project. (Admin. Record, Folder A). Due to continued forest decline, this project "was developed to establish tree seedlings and provide a continuous flow of timber."[4] (Admin. Record, Folder

support of plaintiffs' motion for summary judgment.

3. The regulations implementing the FRRRPA, as amended by the NFMA, require the preparation of a land and resource management plan for each National Forest of the National Forest System to provide direction for multiple use and the sustained yield of goods and services from National Forest System lands in an environmentally sound manner. The regulations also require preparation of an Environmental Impact Statement for each of the proposed land and resource management plans. A Final Environmental Im-

pact·Statement was prepared in connection with the LRMP for the Allegheny National Forest following procedures established by Forest Service regulations for implementing NEPA and the regulations of the Council on Environmental Quality· The Final Environmental Impact Statement describes the range of alternatives considered and discloses their significant environmental effects. (Admin. Record, Folder D–3, Preface, p. ii).

4. Defendant Palmer's·DN/FONSI indicates that a Decision Notice was issued in June, 1995 in connection with the Mortality I Project, which

A, DN/FONSI, p. 1). The DN/FONSI for the Mortality II Project authorizes tree harvesting on 4,775 acres of Management Area 3 through the use of "even-aged" management techniques and tree harvesting on 356 acres of Management Area 2 through the use of "uneven-aged" management techniques, which are defined in the Code of Federal Regulations as follows: [5]

§ 219.3 Definitions and terminology

\* \* \*

*Even-aged management:* The application of a combination of actions that results in the creation of stands in which trees of essentially the same age grow together.... Clearcut, shelterwood, or seed tree cutting [cuts where all or a large percentage of trees in an area are harvested at one time] methods produce even-aged stands.

\* \* \*

*Uneven-aged management:* The application of a combination of actions needed to simultaneously maintain continuous high-forest cover, recurring regeneration of desirable species, and the orderly growth and development of trees through a range of ... age classes to provide a sustained yield of forest products.... Cutting methods that develop and maintain uneven-aged stands are single-tree selection and group selection.

\* \* \*

36 C.F.R. § 219.3.

The logging operations authorized by the Mortality II Project would result in an estimated harvest of 20.7 million board feet of sawtimber and pulpwood products in the first entry and 10.3 million board feet of sawtimber and pulpwood products in the second entry.[6] (Admin. Record, Folder A, DN/FONSI, pp. 3, 5–6). The DN/FONSI for the Mortality II Project also authorizes the application of herbicide treatments to eliminate unwanted understory vegetation, fencing to protect tree seedlings from deer, tree planting and road construction, reconstruction, restoration and obliteration. (Admin. Record, Folder A, DN/FONSI, Table A).

Two alternatives were considered in the Environmental Assessment prepared by the Forest Service for the Mortality II Project. Alternative 1 involved no action, and Alternative 2 involved the proposed action. Alternative 2 was chosen because defendant Palmer concluded that this alternative would move the forest toward the desired future condition contained in the LRMP for the Allegheny National Forest using a variety of management techniques. In the section of the DN/FONSI titled "Rationale for the Decision," defendant Palmer states that he selected Alternative 2 based on the analysis and evaluation described in the Environmental Assessment for the Mortality II Project (Admin. Record, Folder A), the Final Environmental Impact Statement for Understory Vegetation Management (Admin. Record, Folder D–6),[7] and a review of the LRMP and

sought to address the issue of dying timber stands in the Allegheny National Forest through "selected treatments to help restore through the establishment of tree seedlings many of the affected stands." (Admin. Record, Folder D–7). The Forest Service attributes the dying timber stands to a series of natural events, including *insect infestation, disease, defoliation and drought*, as well as the lack of tree seedlings to replace the dead and dying trees due to an overabundance of deer and competition from other vegetation. Defendant Palmer's DN/FONSI also indicates that the Mortality II Project incorporates by reference much of the documentation provided in the Mortality I Project. (Admin. Record, Folder A, DN/FONSI, p. 1).

5.  With respect to Management Area 3, the LRMP provides that even-aged management will be the featured silvicultural system, and that uneven-aged management may be an option on inclusions, such as riparian areas, wet soils or visually sensitive areas. As to Management Area 2, the LRMP provides that uneven-aged management using either group selection or individual tree selection will be the featured silvicultural system. (*Admin. Record, Folder D–1, pp. 4–75 and 4–87*).

6.  A board foot is the amount of wood contained in an unfinished board one inch thick, twelve inches long and twelve inches wide. *Ayers v. Espy*, 873 F.Supp. 455, 460 (D.Colo.1994).

7.  The 1986 LRMP for the Allegheny National Forest allowed forest personnel to consider the use of the herbicide glyphosate on up to 20,000 acres between 1986 and 1995 to help establish

its accompanying Final Environmental Impact Statement. (Admin. Record, Folders D–1, D–2, D–3 and D–4).

On March 28, 1997, a notice of appeal from defendant Palmer's DN/FONSI was filed under 36 C.F.R. § 215 by Curry and Kleissler on behalf of the Allegheny Defense Project, James Bensman on behalf of Heartwood and Philip Coleman on behalf of the Sierra Club. (Admin. Record, Folder C–1). By letter dated April 2, 1997, the appellants were notified by defendant Robert T. Jacobs, Regional Forester for the Eastern Region of the Forest Service and the Appeal Deciding Officer with respect to their appeal, that an Appeal Reviewing Officer (ARO) was assigned to their appeal; that the ARO would review the appeal record and forward a written recommendation on the disposition of the appeal to defendant Jacobs, and that, by May 12, 1997, defendant Jacobs would issue a written decision concerning the disposition of the appeal. (Admin. Record, Folder C–2).

By letter dated May 9, 1997, defendant Jacobs notified the appellants that the ARO found no evidence that defendant Palmer's DN/FONSI violated law, regulation or policy; that the ARO found that the DN/FONSI was consistent with the LRMP; that the DN/FONSI responded to public comments solicited during the analysis process and comment period; that the DN/FONSI adequately assessed the environmental effects of the selected action, and that the issues raised in the appeal were addressed, where appropriate, in the decision documentation. The ARO recommended that defendant Palmer's DN/FONSI be affirmed, and, after his review of the appeal record, defendant Jacobs concurred in the ARO's conclusions concerning the issues raised on appeal. The appellants were referred to the ARO's enclosed recommendation for an explanation of how the specific issues on appeal were addressed.[8] Defendant Jacobs' affirmance of the DN/FONSI of defendant Palmer constituted the final administrative determination with respect to the Mortality II Project. (Admin. Record, Folders C–5, C–6 and C–7).

In their complaint in the present action, plaintiffs allege that the even-aged management techniques to be utilized on approximately 5,000 acres of the Allegheny National Forest under the Mortality II Project have the potential for significant adverse environmental effects, including impacts on wildlife and old growth forests. They further allege that the effects of the Mortality II Project will irreparably destroy the recreational, research and aesthetic values of the affected areas for plaintiffs and others who may visit these areas in the future.

Plaintiffs assert claims against defendants under the NFMA, the MBTA and NEPA, seeking a declaration that defendant Palmer's DN/FONSI and its affirmance by defendant Jacobs were arbitrary, capricious and otherwise not in accordance with applicable law, implementing regulations and guidance documents. Plaintiffs also seek an order enjoining defendants from implementing the Mortality II Project and the proposed timber sales as approved in defendant Palmer's DN/FONSI until the Forest Service has (1) complied with the applicable provisions of the NFMA, the FRRRPA and their implementing regulations; (2) prepared an adequate Environmental Impact Statement; (3) studied, developed and described appropriate alternatives to the proposed actions; and (4) eliminated violations of the MBTA.

### III

### A

Turning first to plaintiffs' claim against defendants under the MBTA, Section 703 of the MBTA provides in pertinent part:

---

tree seedlings. The Final Environmental Impact Statement for Understory Vegetation Management, which was prepared in March, 1991, amended the 1986 LRMP to allow forest personnel to consider the use of the herbicide sulfometuron methyl, by itself or in combination with the herbicide glyphosate, to control grasses and ferns that interfere with the establishment and growth of tree seedlings, shrubs and forbs in future site-specific analyses, while protecting scattered existing tree seedlings. (Admin. Record, Folder D–6, Summary–1).

8. In his May 9, 1997 letter, defendant Jacobs also noted his belief that the MBTA, which appellants claimed would be violated by the logging operations conducted pursuant to the Mortality II Project, was not intended to cover activities such as timber harvesting, and he cited and attached several cases to the letter in support of this belief.

**§ 703. Taking, killing, or possessing migratory birds unlawful**

Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, . . . any migratory bird, any part, nest, or egg of any such bird, . . .

16 U.S.C. § 703.

Plaintiffs allege that the logging operations authorized by the Mortality II Project will destroy the nests and eggs of countless migratory birds within the protection of the MBTA, as well as the birds themselves; that the actions of the Forest Service in authorizing and facilitating the logging operations constitute an unlawful taking and killing of migratory birds, their nests and eggs; that the actions of the Forest Service in authorizing and facilitating the logging operations constitute aiding and abetting the unlawful actions of those persons who themselves cut and haul the timber and in the process destroy migratory birds, their nests and eggs; and that the MBTA limits the lawful discretion of the Forest Service in managing the National Forest System, which limitation is judicially enforceable in this suit pursuant to Section 706(2)(A) of the APA.[9] (Complaint, p. 6). After consideration, the court concludes that it lacks jurisdiction to consider plaintiffs' MBTA claim under the APA, and that, in any event, plaintiffs' MBTA claim against defendants is meritless.

■ As noted by defendants, the agency action that forms the basis of plaintiffs' complaint—the decision to approve the Mortality II Project—was taken pursuant to Congressional authorization conferred, in part, upon the Forest Service by the NFMA and in accordance with the provisions of NEPA. The Forest Service's decision to approve the Mortality II Project was not made pursuant to any provision of the MBTA. Therefore, plaintiffs may not invoke judicial review of their MBTA claim under the APA. (Defen-

dants' Response and Memorandum in Support, p. 48).

■ In a very recent case, *Sierra Club v. Martin,* 110 F.3d 1551 (11th Cir.1997), this precise issue was addressed. In *Martin,* environmental groups brought an action under the APA, seeking relief with regard to timber projects authorized by the Forest Service in the Chattahoochee and Oconee National Forests in Georgia on the ground that the timber projects violated the MBTA. The United States Court of Appeals for the Eleventh Circuit stated in relevant part:

\* \* \*

**B. The Migratory Bird Treaty Act**

Sierra Club claims a right to judicial review of the Forest Service's formal action under the APA, 5 U.S.C. § 702. (footnote omitted). A procedural statute, the APA does not expand the substantive duties of a federal agency, but merely provides the framework for judicial review of agency action. Accordingly, "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.' " *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 753 (9th Cir.1991) (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990)); *see also Preferred Risk Mut. Ins. Co. v. United States,* 86 F.3d 789, 792 (8th Cir.1996) ("[T]he plaintiff must identify a substantive statute or regulation that the agency action had transgressed and establish that the statute or regulation applies to the United States."). Section 706, which provides the scope of review, confirms this understanding. It provides, in relevant part, that a reviewing court shall:

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

9. On July 25, 1997, Allegheny Hardwood Utilization Group, Inc. (AHUG) moved to intervene in this action under Fed.R.Civ.P. 24. In the alternative, AHUG requested amicus status to file a brief addressing plaintiffs' claims under the MBTA. By order dated August 11, 1997, the court denied AHUG's motion to intervene and granted the request for amicus status.

(A) arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law.*

5 U.S.C. § 706 (emphasis added). An agency's action could only fail to be "in accordance with law" when that agency's actions are *subject to that law.* The issue then is whether the Forest Service's actions are subject to the MBTA. That is, the MBTA's prohibitions must be addressed to the Forest Service's formal actions in order for the Forest Service to be capable of violating the MBTA. *See Chrysler v. Brown,* 441 U.S. 281, 298–301, 99 S.Ct. 1705, 1716–17, 60 L.Ed.2d 208 (1979) (determining whether the Trade Secrets Act, 18 U.S.C. § 1905, addresses formal agency action).

The MBTA, by its plain language, does not subject the federal government to its prohibitions. The MBTA makes it unlawful to "take" or "kill" birds. The penalties for violating its prohibitions are set forth in 16 U.S.C. § 707, which provides that a "person, association, partnership, or corporation" will be guilty of a misdemeanor or felony and subject to fine or imprisonment or both for violating the MBTA. (footnote omitted). Sierra Club nonetheless asserts that because the prohibitions are stated broadly—that is, "it is unlawful" to "take" or "kill"—it should be unlawful for anybody, including federal agencies, to "take" or "kill" migratory birds. The MBTA, however, should be read as a whole to derive its plain meaning. *See Beecham v. United States,* 511 U.S. 368, 371–72, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994). The MBTA is a criminal statute making it unlawful only for persons, associations, partnerships, and corporations to "take" or "kill" migratory birds. Moreover, there is no expression of congressional intent which would warrant holding that "person" includes the federal government, thus enabling the United States to prosecute a federal agency, or a federal official acting in his official capacity, for taking or killing birds and destroying nests in violation of the MBTA. Congress has demonstrated that it knows how to subject federal agencies to substantive requirements when it chooses to do so. For example, the term "person" in the Endangered Species Act is defined to include "any officer, employee, agent, department, or instrumentality of the Federal Government." 16 U.S.C. § 1532(13).

The historical context of the MBTA's enactment further demonstrates that it does not apply to the federal government. In 1897, Congress established the National Forest System " '[t]o conserve the water flows, and to furnish a continuous supply of timber for the people.' " *United States v. New Mexico,* 438 U.S. 696, 707, 98 S.Ct. 3012, 3017–18, 57 L.Ed.2d 1052 (1978) (quoting 30 Cong.Rec. 967 (1897)). In light of that purpose, it is difficult to imagine that Congress enacted the MBTA barely twenty years later intending to prohibit the Forest Service from taking or killing a single migratory bird or nest "by any means or in any manner" given that the Forest Service's authorization of logging on federal lands inevitably results in the deaths of individual birds and destruction of nests. The application of the MBTA to the federal government would have severely impaired the Forest Service's ability to comply with the congressional directive to manage the national forests for timber production.

Congress's subsequent enactment of legislation relating to management of the National Forest System buttresses the conclusion that the MBTA does not apply to the federal government. In the NFMA, Congress expressed its intent that the Forest Service manage forests for multiple uses, including timber production. *See* 16 U.S.C. § 528 ("It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."). Through the NFMA, Congress has prescribed the procedures the Forest Service is to follow and the factors it is to consider in making land management decisions. *See* 16 U.S.C. § 1604. In the process of complying with the NFMA, NEPA, and their implementing regulations, the Forest Service ensures that the impact of land management on migratory bird populations is considered in

the context of ensuring viability of native species. 36 C.F.R. § 219.19. The viability regulation requires that, in the context of multiple use planning, habitat be provided within the forest to support a minimum number of reproductive individuals in order to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." *Id.* The Forest Service's compliance with the viability regulation is subject to judicial review in actions challenging timber sales under the APA. *See, e.g., Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 759–63 (9th Cir.1996); *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir.1996). (footnote omitted). Congress intended that the Forest Service follow the NFMA's regulatory process, rather than the MBTA's criminal prohibitions, in addressing conservation of migratory birds.

\* \* \*

110 F.3d at 1554–56.[10]

The court is persuaded by the Eleventh Circuit's rationale in *Martin* that it is without jurisdiction to consider plaintiffs' MBTA claim against defendants under the APA.

▉ Assuming, *arguendo,* that the court had jurisdiction to review plaintiffs' MBTA claim under the APA, the court nevertheless concludes that plaintiffs' MBTA claim is meritless. As noted in numerous cases, the loss of migratory birds as a result of timber sales of the type at issue in this case do not constitute a "taking" or "killing" within the meaning of the MBTA. *See, e.g., Newton County Wildlife Assoc. v. U.S. Forest Service,* 113 F.3d 110 (8th Cir.1997) (timber

sales in national forest did not violate MBTA's prohibition against killing or taking nesting birds, even if Forest Service did not obtain permit under Fish and Wildlife Service regulations implementing MBTA; MBTA terms "take" or "kill" meant physical conduct of sort engaged in by hunters and poachers; and MBTA did not appear to apply to actions of federal government agencies); *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297 (9th Cir.1991) (MBTA prohibition against pursuing, hunting, taking, capturing, or killing migratory bird or any part of its nest or egg, by any means or in any manner, did not prohibit Forest Service from selling and logging timber from lands within areas that might provide suitable habitat for northern spotted owl; MBTA contemplated physical conduct of the sort engaged in by hunters and poachers); *Mahler v. United States Forest Service,* 927 F.Supp. 1559 (S.D.Ind.1996) (habitat destruction and logging during nesting season do not produce "takings" of migratory birds within meaning of MBTA); *Citizens Interested in Bull Run, Inc. v. Edrington,* 781 F.Supp. 1502 (D.Or.1991) (proposed timber sale in Mt. Hood National Forest would not violate MBTA, despite claim that sale would diminish habitat of the northern spotted owl; although the owl is a "migratory bird" within meaning of MBTA, proposed sale did not constitute a "taking" of migratory birds within meaning of MBTA; MBTA was intended to apply to individual hunters and poachers, and a "taking" under the MBTA does not include habitat modification resulting from Forest Service sales activity). Under the circumstances, judgment will be entered in favor of defendants and against plaintiffs as to plaintiffs' claim under the MBTA.[11]

---

**10.** *See also Newton County Wildlife Assoc. v. United States Forest Service,* 113 F.3d 110 (8th. Cir.1997) (APA did not confer jurisdiction on court to grant injunctive relief, under MBTA, against timber sales in national forest, which Forest Service had approved under NFMA; jurisdiction to review sales was conferred by NFMA, not APA).

**11.** In their response to defendants' brief in support of motion for summary judgment, plaintiffs assert that defendants "entirely misconstrue the nature of Plaintiffs' contentions under the MBTA," and that their "argument is distinctly

different than those rejected in the cases cited by the Defendants." (Plaintiffs' Response, p. 17). Plaintiffs contend that, "even if the MBTA does not constitute a legal limit on the Forest Service's discretion that is criminally enforceable or 'enforceable' otherwise in the traditionally understood sense, it nevertheless is contrary to law and an abuse of discretion within the meaning of Section 706 of the [APA] for the Defendants to enter into contracts which will inevitably result in violations of federal criminal law by private individuals—violations which would not occur but for federal authorization." (Plaintiffs' Response, p. 19). Plaintiffs' attempt to distinguish

B

Next, plaintiffs assert a claim against defendants under NEPA, challenging (1) the decision of the Forest Service not to prepare an Environmental Impact Statement (EIS) for the Mortality II Project; and (2) the failure of the Forest Service to consider more than two alternatives in the Environmental Assessment (EA) prepared for the Mortality II Project. With respect to the decision of the Forest Service not to prepare an EIS for the Mortality II Project based on defendant Palmer's "finding of no significant impact" in the DN/FONSI, the Circuits are split on the standard of review to be applied to an agency's decision not to prepare an EIS. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 1861 n. 23, 104 L.Ed.2d 377 (1989). Some Circuits apply the "arbitrary and capricious" standard set forth in Section 706(2)(A) of the APA, while other Circuits apply a "reasonableness" standard. In a 1994 case, the Third Circuit noted that it had previously reserved decision on this question, and that it was again unnecessary to resolve the issue. This conclusion was based on the Third Circuit's determination that the agency decision at issue was reasonable under the circumstances. Therefore, the agency decision necessarily satisfied the lower arbitrary and capricious standard. *See State of New Jersey, Dept. of Environmental Protection and Energy v. Long Island Power Auth.*, 30 F.3d 403, 415 n. 21 (3d Cir.1994).

■ In the present case, the court concludes that the standard of review applied in connection with plaintiffs' NEPA challenge to the failure of the Forest Service to prepare an EIS for the Mortality II Project could affect the outcome of this claim. This conclusion is based on the Third Circuit's articulation of the reasonableness standard of re-

view in *Township of Lower Alloways Creek v. Pub. Service Elec. & Gas Co.*, 687 F.2d 732 (3d Cir.1982) in which the Court stated that to upset an agency determination not to prepare an EIS under the reasonableness standard will require a showing that the project could "in fact" significantly affect the quality of the human environment. By contrast, under the arbitrary and capricious standard of review, plaintiffs must establish a "substantial possibility" that the agency's decision not to prepare an EIS is inconsistent with its NEPA obligations. *Don't Ruin Our Park v. Stone*, 802 F.Supp. 1239, 1248 (M.D.Pa.1992). *See also National Audubon Soc'y v. Hoffman*, 917 F.Supp. 280, 287 (D.Vt.1995) (If substantial questions are raised regarding whether the proposed action "may" have a significant effect on the human environment, the agency must prepare an EIS).

In *Marsh, supra*, the United States Supreme Court was presented with the question whether information developed after the completion of an EIS required the preparation of a supplemental EIS before a construction project subject to NEPA could continue. The Supreme Court noted that "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance," [12] and the Supreme Court proceeded to apply the arbitrary and capricious standard of review. Based on the *Marsh* decision, the court concludes that the standard of review to be applied with respect to plaintiffs' claim that defendants violated NEPA by failing to prepare an EIS for the Mortality II Project is the arbitrary and capricious standard.

Under NEPA, an EIS must be prepared by a government agency before approval of any major Federal action "significantly affecting the quality of the human environ-

their MBTA claim from the MBTA claims rejected in the cases cited by defendants is unpersuasive. First, plaintiffs' argument entirely ignores the fact that the loss of migratory birds as a result of the logging operations authorized by the Mortality II Project does not constitute a "taking" or "killing" within the meaning of the MBTA, and, therefore, the logging operations would not constitute a violation of the MBTA. Second, plaintiffs' argument shows a lack of understanding of judicial review under the APA. As

noted in *Martin, supra*, "[t]here is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint." 110 F.3d at 1554–55. If the logging operations authorized by the Mortality II Project could not constitute a violation of the MBTA, there is no right to judicial review of such claim under the APA.

**12.** *Id.*, 490 U.S. at 374, 109 S.Ct. at 1859.

ment." [13]  42 U.S.C. § 4332(2)(C).  An EIS is a detailed statement by the responsible official on (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(2)(C).

To determine whether the impact of a proposal is significant enough to warrant the preparation of an EIS, an agency must prepare an EA.  40 C.F.R. § 1501.4(b) and (c).  An EA ordinarily "is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary."  *Cronin v. United States Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990), *citing, River Road Alliance, Inc. v. Corps of Engineers*, 764 F.2d 445, 449 (7th Cir.1985).  If the agency determines on the basis of the EA not to prepare an EIS, it must prepare a "finding of no significant impact."  40 C.F.R. § 1501.4(e).

Plaintiffs' principal contentions regarding the failure of the Forest Service to prepare an EIS for the Mortality II Project concern (1) the "extraordinarily" large number of acres affected by the project; (2) the predominant use of even-aged management techniques in the project; (3) the presence of endangered, threatened and sensitive species in the project areas; (4) the proximity of the project areas to an old growth forest and to streams rated of exceptional or high quality; and (5) the failure of the Forest Service to consider the cumulative effects of the Mortality I and Mortality II Projects.[14]  (Plaintiffs' Response, p. 3).

With respect to plaintiffs' first and second contentions, the court agrees with plaintiffs that the magnitude of the Mortality II Project and the selection of even-aged management as the predominant management technique undermine defendants' determination that the project will not have a significant impact on the human environment.[15]  The project involves in excess of 5,000 acres of the Allegheny National Forest of which 4,775 acres have been designated for even-aged management techniques.[16]  In addition, the size of the EA prepared for the Mortality II Project undermines defendants' decision not

---

**13.**  Defendants do not dispute that the Morality II Project qualifies as a "major Federal action" within the meaning of NEPA.

**14.**  Plaintiffs also asserted that an EIS was required for the Mortality II Project because of the various violations of law that may occur as a result of the proposed timber harvesting.  However, as noted above, plaintiffs failed to establish that the logging operations authorized by the Mortality II Project would violate the MBTA or any other law.

**15.**  While the size of the project alone is clearly not dispositive of the issue whether an EIS should have been prepared for the Mortality II Project, it is interesting to note that the two cases cited by defendants in support of their position that an EIS was not required for the Mortality II Project involved relatively small areas of land.  *See Cronin v. United States Department of Agriculture*, 919 F.2d 439 (7th Cir.1990) (EA prepared for timber sale in Shawnee National Forest demonstrated that it was not a *major* Federal action likely to have a *significant* environmental impact because timber sale involved only 26 acres of land and forest supervisor was explicit that the sale was not a precedent for future sales from this area of the forest); *Sierra Club v. Robertson*, 784 F.Supp. 593 (W.D.Ark.1991), *aff'd*, 28 F.3d 753 (8th Cir.1994) (plaintiffs failed to raise specific shortcomings in EA prepared for timber cutting at issue, which involved approximately 200 acres of the Ouachita National Forest).  (Defendants' Response and Memorandum in Support, pp. 15–16).

**16.**  As noted in the undisputed facts, the Mortality II Project authorizes a total timber harvest of 31 million board feet of timber.  In *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir.1973), which involved two timber sales totaling 15.7 million board feet of timber located in the Teton National Forest, the Tenth Circuit held that the sales constituted a major Federal action which significantly affected the human environment.  In enjoining the Forest Service from conducting the planned sales, the Tenth Circuit stated "[t]he clearcutting of the timber planned obviously will have a significant effect on the environment for many years."  484 F.2d at 1250.

to prepare an EIS. The analysis in the EA covers 49 pages, and the EA includes 349 pages of appendices. As noted by plaintiffs, the Council on Environmental Quality (CEQ), which administers and interprets NEPA, has noted that "[i]n most cases, ... a lengthy EA indicates that an EIS is needed." 46 Fed.Reg. 18026, 18037 (1981). (Plaintiffs' Brief in Support, p. 12). *See also National Audubon Soc'y v. Hoffman,* 917 F.Supp. 280, 287 (D.Vt.1995) (The magnitude of the instant proposals to extend road and conduct logging operations, as set forth in an EA totaling over 65 pages, undermines defendants' contention that the proposals are not significant).

Turning to the remaining contentions of plaintiffs in support of their position that an EIS was required for the Mortality II Project, the term "significantly," as used in 42 U.S.C. § 4332(2)(C), is defined in Section 1508.27 of the CEQ regulations implementing NEPA as follows:

### § 1508.27 Significantly

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. . . .

(b) *Intensity.* This refers to the severity of the impact. . . . The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. . . .

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible to be listed in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

■ Plaintiffs' remaining contentions regarding the failure of the Forest Service to prepare an EIS for the Mortality II Project implicate several of the "intensity" factors set forth in Section 1508.27(b). Specifically, it is undisputed that an area adjacent to the Tionesta Scenic Area, an old growth forest, is proposed for logging; that streams of high and exceptional quality run through some of the areas proposed for logging, and that the areas proposed for logging contain habitat for endangered species. Moreover, no analysis of the combined effects of the Mortality I Project and the Mortality II Project is contained in the EA for the Mortality II Project. Rather, the Forest Service indicates in a conclusory manner that the Mortality I Project was taken into consideration, and refers the reader to the EA for the Mortality I Project, as well as other documents on which the Forest Service relied in approving that

project.[17] (Admin. Record, Folder A–1, p. DN–7). This fact is particularly troubling in light of the scope of the Mortality I Project. According to the court's calculation, the EA for the Mortality I Project, which was prepared in June, 1995, indicates that 4,874 acres of Management Area 3 would subject to one type of harvesting or another over the next several years under the alternative chosen for that project, resulting in an estimated harvest within several years of approximately 20.7 million board feet of sawtimber and pulpwood products and an estimated harvest of 39.9 million board feet of sawtimber and pulpwood products over the next 5 to 10 years. (Admin. Record, Folder D–7, p. 2). Further, there is no indication in any of the documents submitted by the Forest Service that further harvesting in Management Area 3 of the magnitude contemplated in the Mortality I Project and the Mortality II Project is not planned for the future.

Finally, the court notes that another "intensity" factor listed in 40 C.F.R. § 1508.27(b) is implicated in this case, although not raised by plaintiffs, and that factor is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Appendix G to the EA for the Mortality II Project sets forth the Forest Service's responses to pre-decision public comments, and that appendix contains 155 pages. Based on a review of this appendix, it cannot seriously be disputed that the Mortality II Project is a highly controversial project.

■ In summary, while the presence of an "intensity" factor alone does not mandate that an EIS be prepared for a particular project,[18] the court is compelled to conclude that, based on the number of "intensity" factors implicated by the Mortality II Pro-

ject, as well as the magnitude of the project, plaintiffs have raised "substantial questions" regarding the issue of whether the Mortality II Project "may" have a significant effect on the human environment. *Hoffman, supra.* Therefore, the failure of the Forest Service to prepare an EIS for the Mortality II Project violated its NEPA obligations, and the decision of the Forest Service to approve the project was arbitrary and capricious.

As to plaintiffs' challenge to the failure of the Forest Service to consider more alternatives for the Mortality II Project, Section 4332(2)(C)(iii) of NEPA requires a detailed statement by the responsible official concerning alternatives for proposed major Federal actions significantly affecting the quality of the human environment. In addition, the regulations implementing NEPA provide that "[t]he interdisciplinary team shall formulate a broad range of reasonable alternatives according to NEPA procedures. The primary goal in formulating alternatives, besides complying with NEPA procedures, is to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits...." 36 C.F.R. § 219.12(f).

■ In the present case, the Forest Service considered only two alternatives with respect to the Mortality II Project—no action and the proposed action involving the overwhelming use of even-aged management techniques.[19] In the court's extensive research in connection with plaintiffs' claims under the NFMA and NEPA, the court did not find one case in which the Forest Service had considered so few alternatives. Although the LRMP for the Allegheny National Forest indicates that even-aged management will be the "featured" silvicultural system for Management Area 3, this provision does not, in the court's opinion, negate

17. While the court recognizes that the regulations implementing NEPA permit "tiering," or incorporating documents by reference, *see* 40 C.F.R. § 1508.28, the Forest Service cannot avoid its NEPA obligation to consider the cumulative effects of the Mortality I Project and the Mortality II Project by simply referring to the documents prepared in connection with the earlier project without any detailed analysis of their combined effect.

18. *See, e.g., Township of Lower Alloways Creek v. Pub. Service Elec. & Gas Co.,* 687 F.2d 732 (3d Cir.1982); *Virgin Islands Tree Boa v. Witt,* 918 F.Supp. 879 (D.Vi.), *aff'd,* 82 F.3d 408 (3d Cir. 1996).

19. In this connection, it is interesting to note that the Forest Service considered five alternatives in the EA for the Mortality I Project.

the obligation of the Forest Service under NEPA and its implementing regulations to consider a "broad range of reasonable alternatives" for the Mortality II Project, some of which involve more extensive uneven-aged management techniques. Under the circumstances, the failure of the Forest Service to consider more than two alternatives in connection with the Mortality II Project was arbitrary and capricious.

### C

Finally, plaintiffs assert a claim against defendants under the NFMA, contending that (1) based on its failure to consider more alternatives, the Forest Service violated the NFMA's requirement that clearcutting be used only where it is determined to be the "optimum" method, and shelterwood and seed tree cutting only where they are determined to be "appropriate," to meet the objectives of the LRMP for the Allegheny National Forest. *See* 16 U.S.C. § 1604(g)(3)(F);[20] (2) the Forest Service violated the NFMA by failing to conform with the maximum size limits permitted for areas subject to the application of even-aged management techniques; and (3) the Forest Service did not take the requisite "hard look" at its proposal for the Mortality II Project because it did not conduct an adequate stand-by-stand analysis of the areas proposed for logging.[21]

With respect to plaintiffs' contention that defendants violated 16 U.S.C. § 1604(g)(3)(F), the Forest Service asserts that the even-aged management techniques proposed under the Mortality II Project "... do not offend NFMA requirements, but rather, fall well within the ambit of those provisions of the NFMA which deal with even-aged management." (Defendants' Response and Memorandum in Support, p. 28). In this connection, in *Ayers v. Espy*, 873 F.Supp. 455 (D.Colo.1994), a suit was brought seeking declaratory and injunctive relief for alleged violations of the NFMA and NEPA arising out of the Forest Service's decision to sell timber. On cross-motions for summary judgment, the district court held, *inter alia*, that the Forest Service did not comply with the procedural requirements of NEPA when it only considered alternatives that led to even-aged harvesting of lodgepole pine.[22] With respect to the plaintiffs' NFMA claim, the court stated:

\* \* \*

Plaintiffs next contend that the government violated NFMA's requirement that clearcutting be used only where it is the "optimum" method and shelterwood cutting only where it is determined to be "appropriate" to meet the objectives and requirements of the relevant land manage-

---

**20.** Section 1604(g)(3)(F) of the NFMA provides in relevant part:

> § 1604. National Forest System land and resource management plans
>
> \* \* \* \* \* \*
>
> (g) Promulgation of regulations for development and revisions of plans; environmental considerations; resource management guidelines; guidelines for land management plans
> As soon as practicable, ... the Secretary shall ... promulgate regulations, under the principles of the Multiple–Use Sustained–Yield Act of 1960 [16 U.S.C.A. §§ 528–531], that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—
>
> \* \* \* \* \* \*
>
> (3) specifying guidelines for land management plans developed to achieve the goals of the Program which—
>
> \* \* \* \* \* \*
>
> (F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be

used as a cutting method on National Forest System lands only where—
> (i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;
> 16 U.S.C. § 1604(g)(3)(F)(i).

**21.** *See, e.g., Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1975) (The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences).

**22.** Specifically, the district court in *Ayers* held that the Forest Service's consideration of eight alternatives, none of which utilized an uneven-aged cutting method for lodgepole pine, did not constitute the broad range of alternatives contemplated by 42 U.S.C. § 4332 or 36 C.F.R. § 219.12(f). 873 F.Supp. at 468.

ment plan. *See* 16 U.S.C. 1604(g)(3)(F). The government argues that no violation of NFMA has occurred because its certified silviculturist found clearcutting to be the "optimal" harvesting methods for units C, CC, and EE and shelterwood cutting "appropriate" for the remaining cuts. I acknowledge the Forest Service's presumed expertise in deciding this issue. *Id.* [*Sierra Club v. Espy,* 822 F. Supp. 356] at 367 [E.D.Tex. (1993)]. The government's argument misses the mark because, yet again, it failed to give meaningful consideration to all feasible and reasonable alternatives. While the Forest Service may ultimately reach this same conclusion, it must comply with NEPA's procedural requirements in doing so. Consequently, in considering all reasonable alternatives on remand, this question must be revisited.

\* \* \*

873 F.Supp. at 468–69.

■ Similarly, in the present case, the court concludes that it will be necessary for the Forest Service to "revisit" on remand the requirements of 16 U.S.C. § 1604(g)(3)(F), when it considers a broad range of alternatives in connection with the Mortality II Project in accordance with the procedural requirements of NEPA.

■ As to plaintiffs' contention that the Forest Service violated its own regulations concerning the maximum size limit of areas to be subjected to even-aged management,[23] the court concludes that this contention is meritless. An exception to the 40–acre size limit for even-aged management exists when the proposed harvesting is the result of a natural catastrophic condition, such as fire, insect and disease attack, or windstorm, and, in the present case, plaintiffs concede that "a partial explanation for the alleged decline of

the forest may involve insect and disease attack." (Plaintiffs' Brief in Support, p. 10). Accordingly, the Forest Service's determination to conduct even-aged management on various areas of Management Area 3 that exceed the 40–acre limit did not violate its own regulations and was not arbitrary and capricious. When the Forest Service prepares an EIS and considers more alternatives in connection with the Mortality II Project on remand, it may again conclude that it is necessary to exceed the 40–acre size limit set forth in 36 C.F.R. § 219.27(d)(2) based on the undisputed natural catastrophic condition that is present in Management Area 3.

With respect to plaintiffs' third and final contention under the NFMA, plaintiffs challenge the alleged failure of the Forest Service to conduct a stand-by-stand analysis of the areas proposed for logging under the Mortality II Project. In particular, plaintiffs challenge the Forest Service's utilization of a computer program, known as SILVAH,[24] to develop "prescriptions" for the various areas selected for treatment in Management Areas 2 and 3.[25] Based on the submissions of the Forest Service in response to the court's August 18, 1997 order, regarding plaintiffs' challenge to the SILVAH program, the court finds such challenge misplaced.

In its submissions, the Forest Service adequately explained the nature of, and the assumptions underlying, the SILVAH program, as well as its reliability. The Forest Service also adequately explained the limited role of the SILVAH program. The program is a guide for practicing foresters to develop management prescriptions. It is not a substitute for professional expertise and judgment.

---

**23.** Under 36 C.F.R. § 219.27(d)(2), the maximum size of individual cut blocks, patches, or strips subject to even-aged management shall not exceed 40 acres. Under the Mortality II Project, twenty-four areas in excess of the 40–acre limit are proposed for even-aged management.

**24.** SILVAH is an acronym for *SILV*iculture of Allegheny *H*ardwoods.

**25.** A "management prescription" is defined in the LRMP for the Allegheny National Forest as

follows: Management practices selected and scheduled for application in a specific area to attain multiple-use and other goals and objectives. At the Forest level for a management area, a management prescription includes the management practices selected and scheduled, the description of the desired future condition of the land, and the standards and guidelines necessary to control the management practices and achieve and maintain the desired future conditions. (Admin. Record, Folder D–1, Glossary A–16).

In the present case, it is clear that the Forest Service did not rely solely on the estimates of mortality provided by the SIL-VAH program to develop prescriptions for Management Areas 2 and 3. Rather, it relied on aerial photography and field data in conjunction with the SILVAH program. Under the circumstances, the court concludes that the manner in which the Forest Service developed the management prescriptions for the Mortality II Project was not arbitrary and capricious. However, this conclusion does not negate the fact that more alternatives should have been considered by the Forest Service before approval of the Mortality II Project.

An order follows.

### ORDER

AND NOW, this 15th day of October, 1997, in accordance with the foregoing memorandum, it is hereby ORDERED as follows:

1. With respect to plaintiffs' claims against defendants under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the motion of plaintiffs for summary judgment pursuant to Fed.R.Civ.P. 56 is granted, and the cross-motion of defendants for summary judgment is denied. Defendants are hereby enjoined from implementing the Mortality II Project prior to the preparation of an Environmental Impact Statement in accordance with 42 U.S.C. § 4332(2)(C), which includes a consideration of the broad range of alternatives required by 36 C.F.R. § 219.12(f).

2. With respect to plaintiffs' claims against defendants under the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, the motion of plaintiffs for summary judgment pursuant to Fed.R.Civ.P. 56 is granted in part and denied in part. On remand, defendants shall reconsider their determination that the even-aged management techniques proposed in the Mortality II Project for Management Area 3 meet the "optimality" and "appropriateness" requirements set forth in 16 U.S.C. § 1604(g)(3)(F). In all other respects, plaintiffs' motion for summary judgment on their claims under the NFMA are denied, and defendants' cross-motion for summary judgment is granted.

3. With respect to plaintiffs' claim against defendants under the Migratory Bird Treaty Act, 16 U.S.C. § 710 *et seq.*, the motion of plaintiffs for summary judgment pursuant to Fed.R.Civ.P. 56 is denied, and the cross-motion of defendants for summary judgment is granted.