**Opinions of the United States Court of Appeals for the Third Circuit**



9-15-2005

# Alghny Def Project v. US Forest Ser

Precedential or Non-Precedential: Precedential

Docket No. 04-2442

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Alghny Def Project v. US Forest Ser" (2005). *2005 Decisions.* Paper 474.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/474

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 04-2442

———————————

THE ALLEGHENY DEFENSE PROJECT, INC.;
HEARTWOOD, INC.;
THE PENNSYLVANIA ENVIRONMENTAL NETWORK;
THE NATIONAL FOREST PROTECTION ALLIANCE;
COMMUNITIES FOR SUSTAINABLE FORESTRY; JIM
KLEISSLER;
NEWKIRK JOHNSON; RACHEL MARTIN; SUSAN
CURRY; RYAN TALBOTT;
BILL BELITSKUS; ARTHUR CLARK; ALEXANDER
DENMARSH;
JOHN A. KESLICK, JR.; SIERRA CLUB

v.

THE UNITED STATES FOREST SERVICE;
ROBERT T. JACOBS, in his official capacity as
the Regional Forester for the Eastern Region;
KEVIN ELLIOT, in his official capacity as
Supervisor of the Allegheny National Forest;


ALLEGHENY FOREST ALLIANCE;
RUFFED GROUSE SOCIETY;

AMERICAN FOREST AND PAPER ASSOCIATION

Intervenor-Defendants in D.C.


Allegheny Defense Project, Inc., Heartwood, Inc.,
National Forest Protection Alliance,
Pennsylvania Environmental Network,
Communities for Sustainable Forestry, The Sierra Club,
Jim Kleissler, Rachel Martin, Susan Curry, Ryan Talbott,
Bill Belitskus, Arthur Clark, Alexander Denmarsh,
John A. Keslick, Jr.,

Appellants

_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
(Civil Action No. 01-cv-00895)
District Judge: Hon. William L. Standish

Argued: May 3, 2005

Before: McKee, VanAntwerpen, Weis, *Circuit Judges,*

(Opinion Filed: September 15, 2005)

THOMAS C. BUCHELE, Esq. (Argued)
P.O. Box 7226
Pittsburgh, PA 15213-0221
*Attorney for Appellants*

THOMAS L. SANSONETTI, Esq.
Assistant Attorney General

ELLEN J. DURKEE, Esq.
MARK R. HAAG, Esq. (Argued)
Attorneys, Department of Justice
Environment & Natural Resources Division
P.O. Box 23795, L'Enfant Station
Washington, D.C. 22026

RONALD MULACH, Esq. (Of Counsel)
Office of the General Counsel
United States Department of Agriculture
Milwaukee, WI 53202

*Attorneys for Appellees United States Forest Service,
Robert T. Jacobs and Kevin Elliot*

STEVEN P. QUARLES, Esq.
J. MICHAEL KLISE, Esq. (Argued)
THOMAS R. LUNDQUIST, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2595

*Attorneys for Appellees Allegheny Forest Service,
Ruffed Grouse Society and American Forest and Paper
Association*

## OPINION

McKee, <u>Circuit Judge</u>

Appellants (collectively referred to as "ADP"), appeal the District Court's grant of summary judgment to defendant, the United States Forest Service, on Counts I and III of their complaint. ADP filed suit under the Administrative Procedure Act ("APA"), and the National Forest Management Act ("NFMA"), to challenge the Forest Services's decision to undertake a site-specific project (the "East Side Project")[1] in the Allegheny National Forest (the "ANF").[2] ADP claimed that the Forest Service improperly selected a harvesting system primarily based upon dollar return, and sought a declaratory judgment that selection of the harvesting system on that basis violated the APA and NFMA. ADP also sought to enjoin the Forest Service from implementing the logging plan on that basis. For the reasons

---

[1] The East Side Project is an effort by the United States Forest Service to address, *inter alia*, tree mortality and decline in Elk, Forest, McKean and Warren counties on the Marienville and Bradford Ranger Districts of the Allegheny National Forest. The Project includes management activities on over 8,000 acres of the eastern portion of the Forest.

[2] The one-half million acre ANF was established in September 1923. It is the only National Forest in Pennsylvania.

4

that follow, we will affirm the District Court's grant of summary judgment.

## I. BACKGROUND.

### *A. History of the ANF*[3]

The ANF occupies more than 500,000 acres in Elk, Forest, McKean and Warren Counties in Northwestern Pennsylvania. Originally, Pennsylvania's forests included stands of very large, mature or overmature trees of differing ages and species. The forests were in varying stages of recovery from natural catastrophes such as fires and windthrow.[4] David A. Marquis, *The Allegheny Hardwood Forests of Pennsylvania*, (1975) ("Marquis manuscript") (manuscript available at A.R., Book 27, Tab 7). Originally, hemlock and beech, which are very shade-tolerant trees, were the most common species. Together, they represented fifty-eight percent of the forest. Maple, birch, white pine, and chestnut represented an additional thirty percent. *Id*. at 8. Black cherry, the tree at issue here, composed only 0.8% of the forest from the years 1793 to 1819. However, by

---

[3]Because these facts are not in dispute, much of this section has been excerpted from the Magistrate Judge's Report & Recommendation.

[4]"Windthrow" occurs when trees are uprooted by excessive winds. *See* https://www.uwsp.edu/natres/nres743/Definitions/Windthrow.htm (last visited Sept. 1, 2005).

1973, 22.6% of the ANF was black cherry, A.R., Book 33, Tab 6 at 445, and today black cherry amounts to 28% of the overstory forest and 47% of the understory forest,[5] A.R., Book 31, Tab 2, Appendix L at 7.

When the forest was primarily inhabited by Native Americans, wildlife was abundant. It included deer, elk, bear, wolves, cougars, wildcats, and lynx. White-tailed deer were also common, though not abundant. The white-tailed deer population was kept down by natural predators and by the limited availability of food. Their numbers were also checked because white-tailed dear were an important source of meat and clothing for the Native Americans. Marquis Manuscript at 9.

The first "settlers" arrived around 1796-97, and timber harvesting became important by 1837. There were, by then, an

---

[5] "Overstory" is the term used for the layer of foliage in a forest canopy including the trees in a timber stand. In the overstory, tall mature trees rise above the shorter immature understory trees. *See* About, *Forestry*, *at* http://forestry.about.com/library/glossary/blforgln.htm (last visited Aug. 24, 2005).

"Understory" is the term used for the area of a forest that grows in the shade of the overstory or canopy. Plants in the understory consist of a mixture of seedlings and saplings of canopy trees together with understory shrubs and herbs. *See* Wikipedia, the Free Encyclopedia, *Understory*, *at* http://en.wikipedia.org/wiki/Understory (last visited Aug. 24, 2005).

estimated 100 sawmills in Warren County, producing forty-five million board feet of timber annually. Industry was developing in the area by 1860, and the first oil well was drilled in 1859. There were also steam railroads, steam-powered sawmills and steam log loaders. By 1869, there were three railroads. Marquis states that, "[b]etween 1890 and 1920, the virgin and partially cut forests were almost completely clearcut in what must have been the highest degree of forest utilization that the world has ever seen in any commercial lumbering area." *Id*. at 15. However, the deer population was still under control because of extensive hunting. Forest fires were common from 1890 to 1930 in areas that had originally contained conifers. Heavy cutting and frequent fires resulted in a reduction of conifers and an increase in hardwoods. Marquis concluded that fires were probably a major factor in the virtual elimination of white pine and hemlock in the Allegheny forests. "In some places, fires burned intensely enough to remove all humus, exposing the clay soil and creating some of the numerous open areas that are still present on the Plateau." *Id*. at 29. As the number of conifers and white pine in the Allegheny Forest was reduced, they were replaced by stands dominated by hardwoods such as black cherry, red maple, sugar maple and white ash; species that are excellent as timber. According to Marquis, heavy cutting favors hardwoods because small hardwood seedlings have a head start on new pine seedlings and can outgrow conifers such as hemlock seedlings. *Id*. at 28. In addition, heavy cutting provides ideal conditions for forest fires, and fires are more damaging to coniferous seedlings than to hardwood seedlings because of the hardwoods' ability to resprout. Species such as black cherry also thrived during the period of 1890 to 1930 due to the absence of shade. In the vast open areas created by

7

clearcutting,[6] black cherry, a shade-intolerant tree, regenerates much more successfully than species such as beech.

The increase in cherry from turn-of-the century logging and the resulting increase in the percentage of cherry in the forests had a cost. The environmental impact included serious flooding, erosion and other harm to the area's watersheds. It also harmed wildlife species, some of which are only now being reintroduced to the area. Furthermore, the popularity of venison in hotels, lumber camps and city markets reduced the deer population to such scarcity that measures had to be taken to increase their numbers. These measures included appointment of a game commission in 1896. At about the same time that affirmative steps were being taken to protect deer, extensive timber harvesting was resulting in increased accumulation of "browse" for the deer to feed on. With predators eliminated, browse accumulating in clearcut areas, and does being protected from hunting, conditions were ripe for the deer population to explode.

In his 1975 article, Marquis reported that after the original forest had been cleared, the wood-using industries of the Allegheny Plateau suffered a significant decline. *Id*. at 32. Those industries did not begin to rebound until around 1960. By 1975, the second-growth forests that sprouted after the clearcuttings of 1890-1920 were fifty to eighty years old. Trees

---

[6]Clearcutting is a forest management technique that involves harvesting all of the trees in one area at a time. Neil Stoloff, *Environmental Law Dictionary* (1993).

in the older stands were therefore large enough to be valuable for timber. According to Marquis, much of the forest land was then under some sort of sustained-yield management. This had been insured by setting large acreages aside in the national and state forests where cutting was carefully regulated and integrated with other uses. Marquis believed that timber cutting would never return to the "cut-and-get-out" type of operation that saw the entire region cut over a thirty to forty year period. *Id.* at 33. However, he recognized there were still problems. For example, it was very difficult to obtain prompt regeneration after the mature trees had been removed. This was partly because of the large deer population.[7] Marquis observed that "[m]uch research is under way to find ways of increasing advance regeneration, of protecting seedlings from deer, and of establishing new stands through seeding or planting so that our Allegheny hardwood forests will continue to provide all of the many goods and services we have come to expect from them." *Id.*

Deer were not the only obstacle to successful regeneration. The ANF was also affected by a series of droughts from 1991 through 1996, as well as epidemic populations of parasites. The latter included elm spanworm, forest tent caterpillar and sherry scallop shell moth. A.R., Book 12, Tab 4, Sub-Tab 17 at 283. This resulted in a series of defoliations across a wide swath of northern Pennsylvania, including the

---

[7] Deer can prevent successful regeneration because they feed on woody twigs thereby destroying new seedlings. Marquis Manuscript at 31-32.

ANF. As a result, a substantial portion of the ANF at issue here was repeatedly defoliated. The stress of these repeated defoliations weakened trees and made them more susceptible to attack by secondary pathogens that actually kill trees. As a result, by 1994, the ANF contained a sizable "zone of mortality" – areas of dead and declining trees.

The species most affected by these events were sugar and red maples, American beech, birch and white ash. A.R., Book 42 at 1. Although black cherry suffered defoliation along with the other species, nutrient-demanding species like sugar maple and white ash suffered greater levels of mortality. Those species are more vulnerable to drought and defoliation stress on sites with low nutrient capital like the unglacieated plateau sites and upper slopes in the areas involved. *Id*. at 133-35, 137.

According to ADP, absent certain measures such as more clearcutting or other even-aged management[8] followed by fertilization and the construction of hundreds of miles of

---

[8]"Even-aged management" refers to a logging method that is characterized by clearcut, shelterwood, or seed tree cutting, resulting in all or a large percentage of trees in an area being cut down at one time, so that when the forest regenerates all the trees that grow will be the same age. A.R., Book 34 at 4-25.

"Uneven-aged management" is a logging method that involves selecting trees to cut either one by one or by groups, resulting in a continuous level of high-forest cover, recurring regeneration of trees, and the orderly development of trees through a range of age classes. A.R., Book 34 at 4-26.

fencing, extensive herbicide use, and thinning to eliminate hardier species of trees, most of the forested areas of northwestern Pennsylvania would eventually revert to the native shade-tolerant beech-hemlock forest.

## B. Statutory and Regulatory Framework

In the Organic Administration Act of 1897, 16 U.S.C. § 475, Congress identified the purposes for which national forests may be established and administered. Those purposes include improving and protecting the forest, obtaining favorable conditions for water flows, and furnishing a continuous supply of lumber for the citizens of the United States." *Id*. More than sixty years after Congress enacted the Organic Administration Act, Congress enacted the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. § 528. That Act provides, in relevant part:

> It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes . . .

*Id*. [9]

In 1969, Congress enacted the National Environmental

---

[9] Under both the Organic Administration Act and the MUSYA, timber production plays a legitimate role in maintaining and administering national forests.

11

Policy Act, ("NEPA"), 42 U.S.C. § 4331, *et seq.* NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") for every recommendation, report or proposal, legislation, or other actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Thereafter, in 1976, Congress enacted the NFMA, 16 U.S.C. § 1604, *et. seq.,* requiring the Secretary of Agriculture to promulgate regulations for the development and revision of land management plans, guidelines and standards prescribed pursuant to the NFMA.

The NFMA further requires that the regulations issued by the Secretary of Agriculture include:

> (3) . . . guidelines for land management plans developed to achieve the goals of the Program which-
>
> > (A) insure consideration of the economic and environmental aspects of various systems of renewable resource management including the related systems of silviculture[10] and protection of

---

[10] According to a web site copyrighted by the University of Missouri, School of Natural Resources, "Silviculture is the science, art and practice of caring for forests with respect to human objectives." *See Silviculture*, http://www.snr.missouri.edu/silviculture (last updated March 9, 2002) (the web site also provides an overview of the science of forestry, forestry terminology, and links to additional resources

forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish; . . .

(D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement . . . (E) insure that timber will be harvested from National Forest System lands only where -

(iv) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber;[11] and

---

for understanding forest maintenance).

[11]ADP has not pursued a claim that the system at issue here was selected in violation of § 1604's prohibition against selecting a system based on the "greatest unit output of timber." Consequently, we are only concerned with ADP's claim that the Forest Service's chosen harvesting system violates § 1604's prohibition against selecting a system based on "greatest dollar return."

13

(F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a
cutting method on National Forest
System lands only where-

> (I) for clearcutting, it is determined to be the optimum method, and for other such cuts, it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

16 U.S.C. § 1604(g).

The Forest Service's regulations implementing these provisions of the NFMA are codified at 36 C.F.R. Part 219. The first "planning rule" was adopted in 1979, substantially amended in 1982, and partially amended again in June and September of 1983. The 1982 rule, as amended, guided the development, amendment, and revision of the forest plans now in place for the ANF as well as all other national forests and grasslands in the United States.

The following provision is particularly relevant to our inquiry:

Management prescriptions that involve vegetative manipulation of tree cover for any purpose shall —

(1) Be best suited to the multiple-

14

use goals established for the area with potential environmental, biological, cultural resources, aesthetic, engineering, and economic impacts, as stated in the regional guides and forest plans, being considered in this determination;

(2) Assure that lands can be adequately restocked . . .

(3) Not be chosen primarily because they will give the greatest dollar return or the greatest output of timber, although these factors shall be considered;

. . .

(6) Provide the desired effects on water quantity and quality, wildlife and fish habitat, regeneration of desired tree species, forage production, recreation uses, aesthetic values, and other resource yields.

36 C.F.R. 219.27(b).

This 1982 rule was superceded in November, 2000, when the Secretary of Agriculture substantially revised certain provisions of Part 219. The new rule included a transitional

15

provision. The transitional provision delayed the application of the new rule to site-specific decisions (such as the East Side Project) until after November 8, 2003. 36 C.F.R. 219.35(d) (2001) ("Site-specific decisions made by the responsible official 3 years from November 9, 2000 and afterward must be in conformance with the provisions of this subpart.").

The Department then proposed revising the 2000 rule and extending the transition period, and it published an interpretative rule clarifying the intent of the transition provision. On January 5, 2005, the Department of Agriculture rescinded the 2000 regulations and replaced them in their entirety with a new final rule entitled "National Forest System Land Management Planning." 70 Fed. Reg. 1022, 1023 (Jan. 5, 2005), to be codified at 36 C.F.R. Part 219. The 2005 regulations do not contain the language found in the 1982 regulations prohibiting forest management that maximizes the dollar return or the output of timber.

On March 23, 2005, however, the Forest Service issued several interim directives that were effective immediately. One of those directives states, in relevant part:

> **Vegetation Management Requirements**
>
> The minimum specific management requirements to be met in carrying out
>
> site-specific projects and activities in the National Forest System (NFS) are set forth in this section . . . a responsible official may authorize site-specific projects . . . to harvest timber only where:
> . . .
>
> > 4. The harvesting system to be used is not

selected primarily because it will give the greatest dollar return.

70 Fed. Reg. 14637, Section 1921.17a (Mar. 23, 2005).[12]

---

[12]The Forest Service maintains that the 2005 Regulations confirm that the 1982 forest planning rule is no longer binding on the Forest Service in the context of site-specific decisions such as the East Side Project. In contrast, ADP contends that nothing in the actual 2005 Regulations expressly states that the 1982 regulations have been entirely repealed or that site-specific decisions made before the 2005 Regulations were issued are now, retroactively, controlled by these new regulations. Furthermore, ADP maintains that, even if the 2005 Regulations apply here, the interim directive issued on March 23rd, 2005, which imposes the same mandatory requirement as the 1982 Regulations and the statute itself, is binding on the Forest Service.

At oral argument, the Forest Service conceded that the question of whether the East Side Project is controlled by the 1982 Rule, the 2005 Rule or § 1604, is inconsequential since the Interim Directive tracks the language of the 1982 Rule and the statute itself. Therefore, the Forest Service admitted, the requirement that the harvesting system not be selected primarily because it will give the greatest dollar return is the same. Because the Forest Service admits as much, we need not decide which Regulations in fact control here, and we will proceed under the premise that the East Side Project must be consistent with this requirement.

17

Under NEPA and NFMA, forest planning and management occurs at the programmatic level and at the project level. At the programmatic level, the Forest Service develops a forest plan for each National Forest. The plan is designed to "provide for multiple use and sustained yield of the products and services obtained [from the forest] in accordance with [MUSYA] . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish and wilderness." 16 U.S.C. § 1604(e)(1). Each forest plan contains (1) a summarized analysis of the management situation; (2) a description of the forest multiple-use goals and objectives, including a description of the desired future condition of the forest and an identification of goods and services that are expected to be produced; (3) multiple-use prescriptions; (4) standards and guidelines; and (5) monitoring and evaluation requirements. The forest plan divides the forest into different management areas ("MA") – units of land in which the provision of a particular management goal is emphasized – and sets out for each MA an emphasis statement, goals, desired future condition, description, and standards and guidelines. The development of the forest plan is accompanied by a public review process conducted in accordance with NFMA and NEPA. *See* 16 U.S.C. §§ 1604(d) and (g)(1).

The second level involves project activities. At this stage the Forest Service proposes, analyzes and decides upon site-specific actions that must be consistent with the forest plan. They must also be consistent with the limitations imposed under NEPA. Therefore, the Forest Service must produce either an EIS

18

and record of decision ("ROD")[13] or an environmental assessment ("EA") and a finding of no significant impact ("FONSI").[14] Each proposed site-specific project may proceed only if it is consistent with the forest plan, has been analyzed under NEPA, and has been specifically approved by the appropriate Forest Service official. 16 U.S.C. § 1604(I).

Pursuant to the requirements of the NFMA, the Forest Service adopted the Allegheny National Forest Land and Resource Management Plan in 1986. The Plan recognized that:

> Forest Plans must assure that they provide for multiple-use and a sustained yield of products and services. In addition, Forest Plans must provide this multiple-use and sustained yield of goods and

---

[13]A Record of Decision is a "document signed by a Responsible Official recording a decision that was preceded by preparation of an environmental impact statement." 36 C.F.R. 218.2.

[14]NEPA requires that federal agencies prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency may first prepare an EA which is less involved and less expensive than an EIS. The agency may then utilize the EA to determine if circumstances require the additional effort of preparing the more involved and more expensive EIS in order to ascertain the potential impacts of the federal action that is contemplated. 40 C.F.R. § 1501.4, 1508.9. If an EA shows that the proposed action will not have a significant effect, the agency may issue a FONSI and proceed without preparing an EIS. *Id*.

19

services from the Allegheny National Forest in a way that maximizes long-term net public benefits in an environmentally sound manner.

The Plan divided the national forest into 11 MAs, determined the desired future condition and featured logging method for each MA, and set both forest-wide and management area specific standards and guidelines.

### C. The Curry Litigation

In 1995, the Forest Service undertook a series of studies to assess tree mortality in the ANF in an effort to identify treatments that could promote a healthy forest ecosystem. After completing an EA and issuing a FONSI pursuant to NEPA, the Forest Service approved a project known as "Mortality I." That project identified ecosystem management actions for treating portions of the ANF that had suffered the most severe mortality and decline. When Mortality I was completed, the Forest Service undertook an additional project, "Mortality II," to continue the efforts begun under Mortality I. Mortality II addressed "ecosystem sustainability, harvesting, and reforestation concerns on additional areas within the zone of mortality." A.R., Book 42 at 2. It also proposed selling timber from within the ANF. More specifically, it authorized 4,800 acres of even-aged logging and 2,750 acres of post-logging herbicide applications in MA 3.0.

Many of the same individuals who are appellants in this appeal initiated an action in the United States District Court for the Western District of Pennsylvania to challenge Mortality II.

They claimed that proposed sales of timber violated the NFMA, the Migratory Bird Treaty Act, and the NEPA. *See Curry v. United States Forest Service,* 988 F.Supp. 541 (W.D. Pa. 1997). Plaintiffs alleged that the even-aged management techniques that were to be used under the Mortality II project could have significant adverse environmental effects on wildlife and old growth forests. They claimed the Project's effects could irreparably destroy the recreational, research and aesthetic values of the affected areas. *Id*. at 546.

The District Court concluded that the magnitude of the Mortality II project and its selection of even-aged management as the predominant management technique undermined the defendants' claim that the project would not have a significant impact on the human environment. *Id*. at 551. The court identified several factors indicative of the severity of Mortality II's impact, and concluded that the Forest Service had not done an analysis of the combined effects of Mortality I and Mortality II. *Id*. at 552. The District Court agreed that the Forest Service's failure to prepare an EIS for Mortality II violated NEPA, and the Services's decision to approve the project without an EIS was "arbitrary and capricious." *Id*.[15]

Accordingly, on October 15, 1997, the District Court

---

[15] The Forest Service had only considered two alternatives for Mortality II – a no action alternative and the proposed action involving the overwhelming use of even-aged management techniques. The court concluded that the Forest Service's action of only considering these two alternatives was "arbitrary and capricious." *Id*. at 553.

issued an order granting the *Curry* plaintiffs' motion for summary judgment on their NFMA and the NEPA claims, and enjoining the Forest Service from implementing the Mortality II Project until it prepared an EIS and considered a broad range of alternative techniques for managing the ANF. The District Court also directed the Forest Service to reconsider its determination that the "even-aged management" techniques proposed by the Mortality II project for MA 3 met the `optimality' and 'appropriateness' requirements set forth in 16 U.S.C. § 1604(g)(3)(F). *Id*. at 556.

### D. The East Side Project

The Forest Service produced an EIS for the East Side Project pursuant to the District Court's order in *Curry.* The East Side Project combined the Mortality II proposal with several other smaller logging proposals and included activities in three of the ANF's management areas: MA 3, MA 2, and MA 6.1. The Project was intended to implement the Forest Plan by restoring the forested ecosystem and moving the area towards the desired future condition described in the Forest Plan. More specifically, the Project was intended to: (1) initiate reforestation treatments to restore the declining forest ecosystem; (2) establish tree seedlings to restore tree regeneration or replacement and to improve the horizontal and vertical diversity in the ecosystem; (3) enhance the vigor of forested stands by regulating stocking and species composition; (4) promote sustainable delivery of forest products in MA 3; (5) supply forest products to meet public demand and to contribute to the economic vitality of local communities; (6) improve road access and safety and maintain water quality by improving and maintaining needed roads and eliminating unnecessary roads; and (7) restore wildlife habitat.

22

ROD, App. at 34A-35A.

Most of the activities comprising the East Side Project, including even-aged logging and clearcutting, were to occur in MA 3 which, at 327,000 acres, is the largest management area in the ANF. According to the Forest Plan, the primary purposes of MA 3 include providing "a sustained yield of high-quality Allegheny hardwood and oak sawtimber through even-aged management," and providing "a variety of age or size class habitat diversity from seedling to mature sawtimber in a variety of timber types." A.R., Book 35 at 4-82. Additional stated primary purposes for MA 3 include providing a habitat for wildlife that prefer the openings created by even-aged cutting and creating and maintaining roads for recreation. *Id*. The Project authorizes 125 miles of road construction and reconstruction, 3,419 acres of post-logging herbicide application, 1,293 acres of fertilizer application, and 2,282 acres of fencing around the large openings created by the even-aged logging. *Id*.

The Project also includes treating vegetation in MA 2, which comprises 6,000 acres of primarily uneven-aged Northern hardwoods and hemlock. Under the Forest Plan this management approach is primarily intended to:

> -Provide a continuous forested scene through practicing uneven-aged management which will promote [shade] tolerant species and produce quality sawtimber.

> -Feature wildlife species associated with shade tolerant vegetation, primarily songbirds and cavity-nesting birds and mammals.

23

-Provide the opportunity for a variety of developed and dispersed motorized recreation opportunities in a Roaded Natural setting.

*Id*. at 4-70.

The Project also includes reforestation treatments in the 101,000 acres comprising MA 6.1. The emphasis in this management area is intended to maintain or enhance scenic quality, provide for dispersed recreation, and provide habitat for wildlife species that require mature and overmature hardwood forests. *Id*. at 4-110. The Forest Plan allows for the use of both even-aged and uneven-aged management in MA 6.1. *Id*. at 4-116.

Pursuant to the ruling in *Curry*, and as the ROD for the Project explains, before finalizing the details of the Project, the Forest Service evaluated five alternatives in detail and additional alternatives were eliminated from detailed study after being evaluated. One of the alternatives considered in detail – Alternative 4 – would have made extensive use of uneven-aged management.[16] In

[16]The ROD explains why Alternative 4 was not selected. The ROD explains:

> The debate over the kind of silvicultural system to emphasize on the ANF did not originate with the East Side Project. The analysis completed for the Forest Plan included a detailed look at the trade-offs between even-aged and uneven-aged

management, including the effects on dispersed recreation, timber harvest volumes and values, and effects on wildlife habitat. The selection of Forest Plan FEIS Alternative D was based on the programmatic decision to emphasize even-aged management in MA 3.0 and uneven-aged management in MA 2.0, and was made because it provided the best mix of goods, services, and uses to the public (maximizes net public benefit per 36 C.F.R. Part 219.1).

As part of the background work for this project, I directed the Forest Silviculturist to examine new research findings pertaining to uneven-aged management, and to assess local application and results of uneven-aged treatments. Ths review did not cause me to question the Forest Plan analysis, therefore I believe the conclusions reached in the Forest Plan are still valid. Success of this silvicultural practice on a large scale is uncertain. There is a likelihood that desired outcomes would not occur even after significant expenditure of funds. Much reliance would have to be placed on experimental or adaptive management techniques. The following provides additional rationale:

1. The limitations and uncertainty with uneven-aged management in the predominant vegetation types

within East Side reduce the opportunity to address more fully the purpose and need within the project area. Alternative 1 offers a broader range of activities to meet Forest Plan direction as provided in MA 3.0.

2. The biology and site requirements of existing shade-intolerant species in even-aged stands do not lend themselves to the application of uneven-aged techniques, increasing the cost of implementation.

3. Several of the shade-tolerant tree species are experiencing decline (maple) or disease (beech). Creating larger acreages of these species through uneven-aged management could result in greater susceptibility of the forest to insect and disease outbreaks. Alternative 1 (and 3) offers an opportunity to maintain a more sustainable forest.

4. Alternative 4 has a cost/benefit ratio of less than one for the major management activities, making it a less desirable choice.

5. Alternative 4 is not as effective, nor is it as reliable, in moving the East Side project area towards the desired future condition as described in the Forest Plan. Importantly, the analysis in the FEIS does not describe attributes of this alternative that lead me to the conclusion that the

26

addition, more limited use of uneven-aged management was

> affected resources in the East Side project would be better served by deviating from the current Forest Plan direction for MAs 3.0 and 6.1.
>
> The environmental conditions within the East Side project area, and more specifically, the particular vegetative conditions within the stands proposed for treatment do not suggest that deviating from programmatic Forest Plan direction (to apply uneven-aged management treatments broadly throughout MA 3.0) is warranted.
>
> Individual timber rattlesnakes and Northern water shrews could be impacted by this alternative, but these impacts would not cause a loss of viability or a trend towards federal listing . . .
>
> The vegetative conditions that result from implementation of Alternative 4 do not contribute towards achieving the desired future condition as described in the Forest Plan, and due to the uncertainty of implementing uneven-aged management on such a large scale, do not contribute towards objectives of the Natural Resource agenda. Therefore, I did not select Alternative 4.

App. at 47a-48a.

27

included in Alternative 1 and 3.

Ultimately, the Acting Forest Supervisor of the Forest Service selected Alternative 1 as the option that would best achieve the Project's intended purposes. The Forest Supervisor found Alternative 1 consistent with the Forest Service Natural Resource Agenda with respect to watershed protection, sustainable forests and roads. App. at 36A-37A. The Supervisor also found Alternative 1 to be the best response to the issues identified for the Project because it could best attain the desired condition envisioned by the Forest Plan. App. at 37A.

The ROD described the proposed activities of Alternative 1, which included transportation activities, wildlife treatments and timber outputs. App. at 39A-40A. The ROD also discussed the environmental consequences of Alternative 1, including a review of the impact on ecological land types, water, transportation, oil, gas and mineral, vegetation, wildlife, heritage resources, recreation, scenic resources, economics, and human health and safety. App. at 44A-47A. The ROD also discussed the reasons that Alternatives 2-5 were rejected, App. at 47A-48A, and it evaluated the use of even-aged logging and considered whether uneven-aged logging could be used. *Id*.

Ultimately, when considering whether Alternative 1 was consistent with the Forest Plan and federal laws, the ROD concluded that even-aged logging is "appropriate," and clearcutting "optimal," in order to regenerate the species and

forest types found in the ANF.[17]  App. at 49A-50A.  The ROD concluded that even-aged logging would move the project area toward the desired future condition set forth in the Land Management Plan.  The ROD states that this management is necessary to restore and maintain a healthy, sustainable forest in the Project area.

E. *Procedural History*

ADP filed an administrative appeal of the ROD on February 5, 2001.  The Regional Forester denied that appeal on March 22, 2001. ADP then filed a ten-count complaint in the District Court, raising multiple issues under NFMA and NEPA.

The District Court ultimately adopted the Magistrate Judge's second Report and Recommendation ("R&R"). *Allegheny Defense Project v. U.S. Forest Service*, No. 01-895, slip. Op. (W.D.Pa. Mar. 23, 2004).  In the first R&R, the Magistrate Judge recommended summary judgment in favor of ADP on Counts I and III, the two counts at issue in this appeal. App. 185A.

Count I alleged that, in the East Side Decision, the Forest Service chose to manage the ANF as a black cherry tree farm in violation of MUSYA, which requires that the national forests be established and administered for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes," 16 U.S.C. § 528, and NFMA, which requires that the regulations specify

---

[17] As previously noted, 16 U.S.C. § 1604(g)(3)(F) requires that clearcutting only be used where it is the "optimum" method, and that shelterwood and seed tree cutting only be used where "appropriate."

guidelines for land management plans which "insure that timber will be harvested from NFS lands only where . . . the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber," 16 U.S.C. § 1604(g)(3)(E)(iv). Count III alleged that the East Side Decision violated the APA and the NFMA because the Decision's determination that clearcutting was "optimal" and that even-aged logging was "appropriate" were based on the fact that these logging methods would produce the most cherry sawtimber and regenerate the most cherry for future logging, thereby giving the greatest dollar return.[18]

After appellees and intervenor-defendants filed objections to the R&R, the Magistrate Judge vacated the R&R and heard oral argument on the outstanding motions for summary judgment. Thereafter, the Magistrate Judge issued her second R&R, recommending that summary judgment be granted in favor of the defendants on Counts I and III. App. at 56A. The Magistrate Judge concluded: "It is clear that the high value of black cherry was a major consideration in developing the East Side Decision. Whether the East Side Decision was based primarily on the fact that black cherry will give the greatest dollar return or the greatest unit output of timber is not so clear." App. at 74A. The Magistrate Judge went on to conclude the following as to Count I:

---

[18] Thus, although Counts I and III state separate causes of action, they both turn on whether the method of forest management and administration selected was chosen "primarily to maximize dollar return."

30

Considering that: (1) Congress did not define the meaning of "primarily" in the NFMA; (2) no court has held that the Secretary of Agriculture has acted arbitrarily and capriciously in violation of the [APA] and the NFMA by selecting even-aged management as the harvesting system primarily because it would give the greatest dollar return or the greatest output of timber; (3) that when the ANF was established in 1923 it had already been substantially clear-cut, resulting in stands of conifers and white pines being replaced by stands dominated by hardwoods such as black cherry, red maple, sugar maple and white ash, which were excellent for sawtimber; (4) the Forest Service is required to consider the costs and benefits of its management practices; (5) in developing the East Side Decision the Forest Service included in its purposes, in addition to providing a sustained yield of high quality Allegheny hardwood, the provision of a variety of age or size class habitat diversity as well as diversity of wildlife; (6) health problems existing in the ANF; and (7) management of the ANF is a complex matter; this Court cannot find that in the East Side Decision Defendants arbitrarily and capriciously selected their harvesting system primarily because it would give the greatest dollar return or the greatest unit output of timber in violation of the NFMA.

App. at 111A-112A.

31

In explaining her grant of summary judgment on Count III, the Magistrate Judge stated:

> Congress again did not define what it meant by the "optimum method" and "appropriate" cuts and these terms would appear to be extremely ambiguous. Therefore, Congress would appear to have delegated to the Forest Service the role of determining what they mean, as long as their definition is not arbitrary and capricious. Plaintiff's admit that the Forest Service made the determination that even-aged logging was "appropriate," and that clearcutting was "optimal" but assert that it did this "in order to regenerate black cherry and other commercially desirable species and achieve the "desired future condition" set forth in the Land Management Plan.
>
> During oral argument . . . counsel for Plaintiffs admitted that their argument as to Count III is essentially the same as their argument in Count I – that the Forest Service chose the logging methods which would produce the most cherry and thereby give the greatest dollar return. For the reasons given in the analysis of Count I, Plaintiffs have not shown that Defendants' determinations that clearcutting is "optimal" and that even-aged logging is "appropriate" are arbitrary and capricious" in violation of the [APA].

32

App. at 113A-114A.

The District Court adopted the Magistrate Judge's second R&R and entered summary judgment for defendants. *See Allegheny Defense Project*, *supra* at 25. This appeal followed.

## II. DISCUSSION.

### A. Jurisdiction

The District Court had jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Article III and the APA require a party challenging an administrative order to show injury in fact. *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). "[T]he alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167, 181 (2000). The Supreme Court has held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Sierra Club v. Morton*, 405 U.S. at 735.

Here, neither the government nor the District Court have

33

questioned appellants' standing; nor do we.[19]   Indeed, we see nothing improbable about the proposition that the Forest Service's proposed activities in the ANF would cause nearby residents to curtail their recreational use of the forest and would subject them to economic and aesthetic harms.  *See Friends of the Earth*, 528 U.S. at 184-85.

### B. Standard of Review

Our review of a district court's grant of summary judgment in favor of an administrative agency is de novo. *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 693 (3d Cir. 1999).  Moreover, under § 706 of the APA, we review the agency's final decision to determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Though the agency is entitled to some deference, *see Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 198 (3d Cir. 1999), "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review," *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 178 (3d Cir. 2000).

### C. Alleged Deficiencies of the East Side Project

---

[19] "[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts, in every appeal presented to it, regardless of whether the parties contest jurisdiction." *Lewis v. Int'l Broth. of Teamsters,* 826 F.2d 1310 (3d Cir.1987) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534 (1986) (internal quotations omitted)).

34

ADP's main contention is that the Forest Service's decision to use even-aged harvesting combined with fertilizer and herbicide, and fencing, violates the APA and the NFMA "because it seeks primarily to achieve the highest dollar return by . . . emphasizing the logging and regeneration of black cherry timber, which is by far the most commercially valuable species in the Allegheny." ADP Reply Brief at 2. ADP also contends that the Forest Service incorrectly determined that the even-aged logging authorized by the Project was "appropriate" and the clearcutting "optimal" when that logging was authorized primarily to give the greatest dollar return.[20] The numerous factors ADP cites to support that position include:

- In its summary judgment brief, the Forest Service asserted that the ROD adopted the recommendations of the Northeastern Forest Experimental Station as set forth in the Marquis manuscript. Page one of the manuscript states that it is designed primarily as a guidebook for practicing foresters whose goal is timber production. Also, the Magistrate Judge found that

---

[20] Although ADP articulates two different arguments, these two arguments are merely different sides of the same coin. Accordingly, the Magistrate Judge realized that they did not require a separate analysis. *See* App. at 114a ("During oral argument . . . counsel for Plaintiffs admitted that their argument as to Count III is essentially the same as their argument in Count I – that the Forest Service chose the logging methods which would produce the most cherry and thereby give the greatest dollar return.").

the object of the manuscript "was to produce the maximum profit from even-aged management."[21]

•  In the same brief, the Forest Service cited to a different Marquis publication entitled, "Quantitative Silviculture for Hardwood Forests of the Alleghenies" and explained that it used the publication's "SILVAH" system as the scientific basis for the ROD.  ADP contends that the express goal of
the SILVAH system is to "maximize growth and value."  ADP also maintains that this document is a "lengthy how-to manual for cultivating black cherry and other high value hardwood species," and the document warns that the use of uneven-aged logging will result in fewer Allegheny Hardwoods and less profits.

•  Several monitoring reports, including one specifically cited by the Forest Service, document how management techniques similar to those authorized by the ROD have negatively impacted other sites in the ANF.  Thus, according to ADP, by choosing to employ these techniques, black cherry promotion and regeneration and the resulting financial returns must be the Forest Service's primary goals.

---

[21]The Magistrate Judge found the Forest Service's adoption of the manuscript "troubling."  App. at 110A.

36

- In its response to ADP's administrative appeal of the ROD, the Forest Service noted that more uneven-aged logging was not included because it would not regenerate black cherry. Additionally, the Forest Service explained that fertilizer would be applied to encourage more black cherry and not because the forest's soils were otherwise depleted.

ADP also maintains that the Forest Service's explanations for why it selected the particular silvicultural techniques are merely pretextual since "none of these justifications can even begin to explain the East Side Decision's overwhelming preference for even-aged logging and the accompanying techniques." ADP Brief at 38. For example, according to ADP:

- The Forest Service cannot justify its choice of silvicultural techniques by relying on the assertion that the success of uneven-aged management is uncertain since, according to the Magistrate Judge, uneven-aged management could work if it was supported by the same supplemental management – herbicides and fencing – that the Forest Service uses to support even-aged management. According to ADP, research has found that uneven-aged management could be used to obtain adequate regeneration of diverse tree species and at the same time promote and protect other multiple use resources.

- Health concerns also cannot justify the Forest Service's silvicultural practices since (1) thousands of acres that will be subjected to the Forest Service's management scheme are quite healthy and are not threatened by disease, and (2) even-aged management creates stands with their own health problems, including specific threats to the health of black cherry trees such as the Cherry Scallop Moth and Ground Level Ozone caused by pollution.

- The Forest Service's argument that it chose even-aged management to maintain diversity is not supported by the record. According to ADP, even-aged management would result in the least amount of old growth habitat, the highest amount of soil compaction, the lowest amount of standing dead and lying dead trees for wildlife habitat, the highest acreage of forest with more than 30% stocking of interfering ferns and grasses, and the lowest acreage of forest with an intact mid-story of all alternatives. Conversely, according to ADP, simply not logging or using more uneven-aged harvesting techniques would create the most diversity in the ANF.

- The Forest Service cannot justify its practices by claiming that it is simply maintaining conditions created by earlier logging since the same harvesting system authorized by the ROD has in the recent past significantly increased the ANF's

38

black cherry component.

- The Forest Service cannot blame the white-tailed deer for the ANF's increased conversion to a forest dominated by black cherry since, according to ADP, the even-aged logging being employed by the Forest Service contributes to the deer problem.

## D. Analysis

The Forest Service maintains that the East Side Project is consistent with NFMA's prohibition against selecting a harvesting system primarily because it will give the greatest dollar return. We agree. Although it is beyond serious contention that the Forest Service considered the economic benefits of generating black cherry stands in structuring the Project, economic concerns may be considered under the Organic Act, MUSYA and NFMA.[22] Indeed, Congress has mandated consideration of economic factors. *See* §

---

[22]Indeed, in its brief, ADP admits that:

the financial returns to be gained from proposed logging are a relevant consideration and the East Side Decision is not illegal simply because the Forest Service notes and considers the commercial value of its proposed logging.

ADP Brief at 28.

1604(g)(3)(A) (providing that forest planning regulations *shall* include guidelines that "insure consideration of the economic and environmental aspects of various systems of renewable resource management"). However, the record does not support ADP's claim that economic considerations were paramount or determinative in the Forest Service's selection of appropriate forest management techniques for the Project.

"When a party challenges agency action as arbitrary and capricious the reasonableness of the agency's action is judged in accordance with its stated reasons." *In re: Comptroller of the Currency*, 156 F.3d 1279 (D.C. Cir. 1998) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). Moreover, we can assess the facts and evidence of record; we cannot speculate about the agency's ulterior motives to an extent not supported by the record. *See Ohio Forestry Ass'n. Inc. v. Sierra Club*, 523 U.S. 726, 736-37 (1998) (chastising the Court of Appeals for the Sixth Circuit for surmising, without evidence supported by "record citation," that "the Forest Service suffered from a kind of general 'bias' in favor of timber production and clearcutting."). Here, the voluminous record illustrates that the Forest Service's decision to utilize even-aged management in MA 3 was not arbitrary and capricious. Rather, the record shows that decision was based on a thorough analysis of a variety of both economic and non-economic factors. As the ROD explains, the overall purpose of the Project is the implementation of the Forest Plan by "maintain[ing] and restor[ing] healthy and resilient watersheds and ecosystems." App. at 33A. In order to do this, the Forest Service must initiate reforestation treatments, establish tree seedlings, improve the horizontal and vertical diversity in the ecosystem, regulate stocking and species composition, supply forest products to

40

meet public demand and to contribute to the economic vitality of local communities, and restore wildlife habitat. *See* App. at 34A-35A.

The ROD also embraces some of the diverse considerations that provided the original justification for the adoption of the Forest Plan in 1986. Those considerations included tree species mix; wildlife species mix; forest structure; and the fact that uneven-aged management is more problematic in terms of deer browsing,[23] requires more and longer-term use of herbicides, and is less cost-effective than even-aged management.[24] *See* App. at 49A.

---

[23] The ROD explains:

> White tailed deer cause extensive damage by feeding on seedlings of tree species found on the ANF. Only even-aged methods that provide abundant sunlight enabling seedlings to quickly grow out of the reach of deer are practical. Even then, reforestation practices (such as fencing, fertilization, and site preparation) are often necessary. The choice of silvicultural systems would be wider were it not for the unusually high deer browsing that occurs on the ANF.

App. at 49A.

[24] In a lecture included in "Quantitative Silviculture for Hardwood Forests of the Alleghenies," the authors expressed

41

The record shows that in stands treated with even-aged methods, the ANF is achieving adequate levels of regeneration. In fact, there is as much as a 94 percent reforestation success rate. A.R., Book 43 at F-7-8; *see also* App. 38A (Magistrate Judge second R&R). Moreover, the record reflects the "marginal" regeneration success rates of uneven-aged management. An Appendix to the East Side EIS explains:

> reforestation success with uneven-aged management has been very marginal, whereas results with even-aged management have been quite good. Large scale implementation is not consistent with the objectives of certain management areas established by the Forest Plan, and it does not seem prudent until more is known about how to develop adequate tree seedlings of appropriate species.

A.R., Book 43 at F-7. Given this record, we simply cannot

_____

their concern for the use of uneven-aged management:

> We must include one very important warning in our discussion of [uneven-aged management], however. There is no assurance that [uneven-aged management] can be used successfully in any region where deer populations are high . . . There are many locations where reproduction simply CANNOT be obtained.

A.R., Book 28 at 334 (emphasis in original).

42

conclude that the Forest Service should refrain from pursuing a plan that addresses all of the aforementioned non-dollar related factors merely because the Forest Service considered economic factors as well.

The ROD also documents why the Forest Service chose Alternative 1 (emphasizing even-aged management) over Alternative 4 (emphasizing uneven-aged management). The reasons include the following: (1) even-aged harvesting better achieves the desired future condition in MA 3 of Allegheny hardwoods because such shade-intolerant species regenerate better with larger forest opening; (2) several of the shade-tolerant tree species are experiencing decline or disease, and uneven-aged management could result in greater susceptibility to insect and disease outbreaks; (3) uneven-aged management is less cost effective; and (4) there are general uncertainties as to whether uneven-aged management could meet the needs of the Plan. ROD, App. at 48A. Additional non-economic reasons for selecting Alternative 1 include the fact that: (1) clearcutting is the optimum method for maintaining aspen due to its intolerance for shade; (2) even-aged management provides abundant sunlight enabling seedlings to quickly grow out of the reach of deer; and (3) even-aged management improves age-class distribution, increases species diversity and moves the project toward the desired future forest condition for the various MAs. ROD, App. at 44A-47A.

ADP stresses the fact that even-aged management tends to increase the amount of black cherry, and we realize that black cherry is a very profitable species. Nevertheless, we cannot accept the inference that the Forest Service reached this result

43

primarily because of the economic rewards endemic in even-aged management given the conditions in the ANF. ADP's argument would require us to invalidate any properly developed forest management plan that might have a concomitant economic benefit; a result that is even less defensible given the congressional mandate to consider economic concerns as long as they do not drive the Plan.

This record simply does not support the inference that ADP asks us to draw - that even-aged management was chosen primarily because it will give the greatest dollar return. The record demonstrates that the Forest Service's emphasis on black cherry is not based on the value of the tree alone. Black cherry also has numerous environmental benefits, including its superior resilience to drought, deer, and pests such as insects.[25] The Forest Service is surely not required to ignore these benefits merely because black cherry has the additional benefit of its commercial value. Accordingly, we cannot conclude that the Forest Service's choice of silvicultural practices, which emphasized the regeneration of black cherry, was based primarily on financial concerns. Although ADP may disagree with the Forest Service's decision to manage MA 3 through even-aged harvesting, this disagreement is insufficient to establish that the Forest Service's choice of Alternative 1 was

---

[25]In light of these environmental benefits, it is also reasonable to conclude, that the resilience of black cherry and its robustness have contributed greatly to the increase in that species of Allegheny Hardwood in the ANF. We cannot say the tree's success is primarily the result of an economically determined management plan of the Forest Service.

44

arbitrary, capricious, or an abuse of discretion. The record provides ample support for the Forest Service's stated rationale and confirms that even-aged management was not selected primarily to secure the greatest dollar return.

## III. CONCLUSION.

Accordingly, for the reasons set forth above, we will affirm the District Court's order granting summary judgment to the Forest Service on counts I and III of ADP's complaint.

_____